**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ROY LIND, et al.** | § | |
| | § | |
| **v.** | § | **A-13-CV-249-DAE** |
| | § | |
| **INTERNATIONAL PAPER COMPANY** | § | |
| **and TEMPLE-INLAND INC.** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE DAVID EZRA
       SENIOR UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' Motion for Summary Judgment (Dkt. No. 18); Plaintiffs'

Response and Cross-Motion on Ambiguity (Dkt. No. 21); and Defendants' Reply and Response to

Plaintiffs' Cross-Motion on Ambiguity, and Motion to Strike Plaintiffs' Summary Judgment Evidence

(Dkt. No. 26). The undersigned submits this Report and Recommendation to the United States

District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules

of the United States District Court for the Western District of Texas, Local Rules for the Assignment

of Duties to United States Magistrate Judges.  The court held a hearing on the motions on June 3,

2014.

## I.    GENERAL BACKGROUND

This is a breach of contract case. Plaintiffs Roy Lind, Steven York, Ronald Zimbelman,

Irving Paul, and Charles Holland ("Plaintiffs") were executives in Temple-Inland Inc.'s ("TIN")

Corrugated Packaging Division.  As part of their compensation, at different times each Plaintiff

entered into a Change in Control ("CIC") Agreement with TIN, which provided for payments to

Plaintiffs if their employment was terminated within a set time frame following a change in control.[1]

---

[1]Plaintiffs Holland, Lind, Paul and Zimbelman signed their most recent CIC Agreements in
2008. Plaintiff York signed his effective May 9, 2011.

The "Whereas" clauses in those agreements noted that TIN considered it essential to "foster the continued employment of key management personnel," and stated that the board was aware that the possibility of a change in control could be distracting to management personnel, and believed steps should be taken to "reinforce and encourage the continued attention and dedication" of management. Consistent with this, the CIC Agreements provided for significant severance payments to Plaintiffs in the event they were terminated within a specified period after a change in control of the company. Dkt. No. 18, Exs. A-1 to A-5 at ¶ 6.  The particular contract language at issue in this motion, which is identical in each agreement, states that the Plaintiffs would be entitled to:

> two times . . . the Executive's target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination (or if higher, in respect of any of the three preceding fiscal years).

*Id.* at ¶ 6.1(A)(ii).

All Plaintiffs except for York executed more than one CIC Agreement during the course of their employment, and, except for York, the final agreement each signed was effective November 7, 2008.[2]  York, who was not hired until April 1, 2009, signed his only CIC Agreement effective May 9, 2011.  *Id.*, Ex. A-4.  The earliest of the CIC Agreements signed by any of the Plaintiffs was executed in 2000 by Zimbelman, and contained a ¶ 6.1(A)(ii) that was identical to the clause contained in the 2008 version governing this matter.  *Compare* Dkt. No. 21, Ex. 2 *with* Dkt. No. 18, Ex. 5.  The evidence submitted with Plaintiffs' response and cross motion reflects that the 2000 agreement Zimbelman signed was accompanied by a one page "Summary of Terms" prepared by

---

[2]In addition to the November 7, 2008 agreements, Holland executed a CIC Agreement effective February 2, 2007, Lind signed one effective August 3, 2007, Paul executed agreements effective April 27, 2005, and March 24, 2006, and Zimbelman executed agreements effective October 2, 2000, August 12, 2002, and March 24, 2006.  The November 7, 2008 CIC Agreements each of these Plaintiffs executed explicitly superseded any prior CIC Agreement.  Dkt. No. 18, Exs. A-1 to A-3, A-5 at p. 1 (final "Whereas" clause) and ¶ 11.

TIN, which purports to summarize the CIC Agreement.  Dkt. No. 21, Ex. E at ¶ 2.  In describing the compensation and benefits of the agreement, the summary stated that in the event of a change in control, the executive would receive, among other benefits, a "lump sum equal to two times highest annual incentive bonus in last three years."  *Id.* at Ex. 2 (RZ0062).  Plaintiffs note that this is not the same as two times the *target* bonus, and contends that this inconsistency between the Summary of Terms and the contract language creates an ambiguity regarding the meaning of the language in the CIC Agreement.  Notably, none of the other Plaintiffs received this summary, and there is no evidence that they were aware of it prior to the lawsuit being filed.

As discussed earlier, all but one of the Plaintiffs executed their operative CIC Agreement effective November 7, 2008.  In transmitting that agreement to the Plaintiffs, Temple Inland's in-house counsel, Leslie O'Neal, circulated with the agreement a memorandum explaining that the purpose of that agreement was to "comply with technical requirements in a tax law that was adopted in 2004," so as to avoid the Plaintiffs being "subject to an additional 20% excise tax if [they] ever receive a change in control payment and the Company could not pay the tax for [them]."  Dkt. No. 21, Ex. 5.  Consistent with this, the second and third-to-last "Whereas" clauses in the 2008 CIC Agreement state:

> WHEREAS, the Executive is currently a party to a Change in Control Agreement (the "Existing CIC Agreement) with Temple-Inland; and
>
> WHEREAS, the Company and the Executive intend this Agreement to continue to provide the protections afforded by the Existing CIC Agreement except to the extent the provisions of the Existing CIC Agreement would give rise to a tax under Section 409A of the Code or to the extent the provisions of the Existing CIC Agreement are otherwise modified herein;

*Id.*, Ex. 1 (at. IPC 000293).

Attached to O'Neal's memo was a red-lined version purporting to show all changes proposed from the CIC Agreements then in effect for each Plaintiff , as compared to the new version proposed

by TIN.  With regard to three of the four Plaintiffs who executed the agreement in 2008, the red-lined version was accurate.  However, with respect to Lind, the red-lined version failed to note a substantive change TIN had made to the language of ¶ 6.1(A)(ii).  The CIC Agreement in effect for Lind prior to the 2008 agreement stated that if a change in control occurred and Lind was terminated thereafter, he was entitled to two times:

> the Executive's target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination (or, if higher, *the greatest actual annual bonus* in respect of any of the three preceding fiscal years.

Dkt. No. 21, Ex. 4 (emphasis added, closed parentheses omitted in original).  The 2008 agreement that Lind executed eliminated the italicized phrase, so that the parenthetical in the 2008 version reads: "(or if higher, in respect of any of the three preceding fiscal years)."  Dkt. No. 18, Ex. A-2. Notwithstanding the fact that the proposed agreement transmitted to Lind in 2008 contained this change, it was not identified as a change in the red-lined version transmitted by TIN's in-house counsel to Lind.  Lind executed the 2008 version making this change. His affidavit is silent on this issue, but the Court assumes that Lind did not notice the change when he signed the document.

On September 6, 2011, TIN entered into an Agreement and Plan of Merger with International Paper Company and Metal Acquisition, Inc. ("IP").  The merger was completed on February 13, 2012.  Under the CIC Agreements, the merger constituted a "change in control."  Plaintiffs were terminated in March and July of 2012, which triggered their entitlement to payments under the CIC Agreements.  Along with twice their base salaries and other monies, the Plaintiffs were paid amounts IP stated equaled two times each Plaintiff's highest *target* bonuses from the preceding three years. Dkt. No. 18, Ex. A, ¶ 15.  Plaintiffs dispute this payment, and contend in their lawsuit that they are entitled to two times the highest bonus actually paid in the preceding three years.  Defendants assert that this is incorrect, and argue the unambiguous terms of the CIC Agreements provide for the

4

payment to be based on the *target* bonus, not the actual bonus from the prior three years.  Defendants seek summary judgment on this point.[3]  In response, Plaintiffs contend that the CIC Agreements are ambiguous, and make a cross-motion for summary judgment that the relevant clause of the CIC Agreements is ambiguous.  As narrowed at the hearing, the parties concur that the two issues now before the Court are: (1) whether Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim that their bonuses were not properly calculated pursuant Section 6.1(A)(ii) of the CIC Agreements; and (2) whether the relevant contract provision is ambiguous.[4]

## II. ANALYSIS

### A.     Summary Judgment Standard

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

---

[3]Plaintiffs' suit also challenged several other aspects of the payments, contending their entitlement to: (1) incentive compensation, including stock options and restricted shares for 2011 and that part of 2012 during which they were employed; (2) an additional excise tax "gross up" on the amounts they claim to be owed under the Agreements; and (3) payment of their legal fees.  The Defendants' motion sought summary judgment on these claims as well.  At the hearing on the motions, Plaintiffs abandoned any claims for long term incentive payments pursuant to § 6(C), and the parties agreed that any claims about calculation of their pro-rata bonuses pursuant to § 6.1(F) are not ripe for decision by the Court at this time.  The parties similarly agreed that the tax "gross up" and attorney's fees issues should not be addressed at this juncture.

[4]As discussed in the prior footnote, resolution of these issues will not resolve the entire case.

### B.      Is Section 6.1(A)(ii) ambiguous?

The primary issue raised by the cross motions is whether Section 6.1(A) of the CIC

Agreement is ambiguous as a matter of law.   For each Plaintiff, that section states:

> In lieu of any further salary payments to the Executive for periods subsequent to the Date of Termination, the Company shall pay to the Executive a lump sum severance payment, in cash, equal to two (2) times the sum of (I) the Executive's highest base salary as in effect during the three-year period ending immediately prior to the Date of Termination and (ii) the Executive's target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination *(or if higher, in respect of any of the three preceding fiscal years)*. [Emphasis added].

There is no dispute regarding the first component of this formula, as all parties agree that each

Plaintiff was paid two times his highest base salary from the preceding three years.   The dispute

centers on the second half of the payment described in § 6.1(A).   Defendants assert that the plain

language of subsection (ii) provides that Plaintiffs are entitled to twice the highest target bonus

during the preceding three years.   Plaintiffs maintain that the section is ambiguous regarding whether

they are entitled to twice their highest *target* bonus, or two times their highest *actual* bonus.

Defendants disagree, arguing that Plaintiffs' interpretation is contrary to the plain language of the

Agreement and therefore is an unreasonable reading of the clause.   In their Reply, Defendants expand

on their argument, and submit evidence that each division of TIN had a Management Incentive Plan

("MIP") which set a "target incentive" at a certain percentage of each executive's salary.   They

contend that the MIP is the "annual bonus or incentive plan" referred to in § 6.1(A)(ii), that the

highest target bonus in the three years preceding each Plaintiff's termination including the year of

termination was the bonus for 2012, and that Plaintiffs are entitled to—and have been paid—two

times that target bonus.   Dkt. No. 26, Exs. A, 16-17.

6

The most fundamental rule of contract construction under Texas law[5] is a familiar one—courts ascertain and give effect to the parties' intentions based on what the parties have expressed in the contract itself. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805–06 (Tex. 2012). Thus, to discern the parties' intent, Texas courts " examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). This analysis begins—and in most cases ends—with the contract's express language; if the court determines that the contract's language can be given a certain or definite legal meaning or interpretation, then the court resolves the dispute based on that language. *Id.* But "if the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous, creating a fact issue on the parties' intent." *Id.* Whether or not a contract is ambiguous is a question of law for the court to decide. *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). A disagreement over the meaning of a contract does not mean that it is ambiguous, as opposing interpretations of contract language must both be "reasonable" before there is an ambiguity. *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 120 (Tex. App. – Corpus Christi 1999, pet. denied). Ambiguity in a contract may be "patent" or "latent." Patent ambiguity is evident on the face of the contract. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears

---

[5]Because the Court's jurisdiction over this case is based on diversity of citizenship, the Court applies the law of the forum state in deciding the substantive legal issues in the case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *State Farm Auto Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 688 (2014). Moreover, the agreements at issue provide that Texas law governs the "validity, interpretation, construction and performance" of the agreement. *See, e.g.*, Dkt. No. 18, Ex. A-1 at ¶ 11. Thus, there is no dispute that the Court must apply Texas law to resolve the disputes in this case.

by reason of some collateral matter. *Id.*[6]  When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue for the jury. *Coker*, 650 S.W.2d at 394 (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980)).

### 1.     Ambiguity argument based on "surrounding circumstances"

Central to the question of whether § 6.1(A) is ambiguous is another dispute, regarding what "surrounding circumstances" the Court may consider in making that determination.  Texas law has long held that "[w]hether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole *in light of the circumstances present when the contract was entered.*" *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 449-50 (Tex. 2011) (internal citations omitted) (emphasis added). *See also Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) (stating that in deciding if a contract is ambiguous, a court should review the contract "in the light of surrounding circumstances").  There is an obvious tension between this principle and the equally well-settled rule that "parol evidence is not admissible to render a contract ambiguous. . . ." *Lewis v. East Texas Finance Co.*, 146 S.W.2d 977, 980 (Tex. 1941). Distinguishing "surrounding circumstances" from "parol evidence" is no easy task. What are surrounding circumstances to one court is parol evidence to another, and as a result the case law on this issue is less than consistent at times.  There are, however, some central principles in this area. First, the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).  Second, relying on

---

[6]The classic example of a "latent" ambiguity is a contract requiring delivery of goods to "the green house on the 200 block of Oak Street," where there are two green houses on the 200 block of Oak Street.

Williston on Contracts, the Texas Supreme Court has defined "surrounding circumstances" to include "the commercial or other setting in which the contract was negotiated and other *objectively* determinable factors that give a context to the transaction between the parties." *Id.* (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS §32.7 (4th ed. 1999)) (emphasis added).

Plaintiffs ask the Court to consider five categories of documents as "surrounding circumstances" to inform the decision whether ¶ 6.1(A)(ii) is ambiguous:[7]

1.    Zimbelman's CIC Agreement from 2000;

2.    The Summary of Terms which accompanied Zimbelman's 2000 agreement;

3.    Leslie O'Neal's memo transmitting the 2008 CIC Agreements;

4.    The red-lined versions of the 2008 agreements attached to O'Neal's memo; and

5.    Zimbelman, Holland, Lind, and Paul's CIC Agreements that were in effect when the 2008 CIC Agreement was made effective.

From these documents, Plaintiffs make two arguments. ***First*** (although not stated in precisely these terms), they claim:

•    ¶ 6.1(A)(ii) in Zimbelman's CIC Agreement from 2000 contains the exact same language as that section in all of the Plaintiffs' 2008 Agreements.

•    When it summarized the terms of ¶ 6.1(A)(ii) in the 2000 Agreement, TIN described it as entitling the Executive to two times his or her highest actual bonus in the preceding three years.

---

[7]Defendants have moved to strike these documents as summary judgment evidence, arguing that because there is no ambiguity in the contract, the Court may not consider them. Dkt. No. 26. This puts the cart before the horse. As noted, in deciding whether a contract contains an ambiguity, the Court must consider surrounding circumstances as they existed as the time of the formation of the contracts, and concomitantly, the Court must consider whether these documents qualify as surrounding circumstances. The documents are properly considered as summary judgment evidence for the purpose of determining whether or not they qualify as evidence of surrounding circumstances. The Court therefore **DENIES** that portion of Dkt. No. 26 comprised of Defendant's Motion to Strike Summary Judgment Evidence.

- This description raises a question regarding whether TIN intended to pay the Executive two times the actual bonus or two times the target bonus, thereby creating an ambiguity in the contract.

- From 2000 to 2008, in all of the various CIC Agreements the Plaintiffs executed (other than Lind's), the language of ¶ 6.1(A)(ii) never changed.

- The O'Neal memo and "Whereas" clauses in the 2008 agreement make it clear that TIN did not intend to change the meaning or terms of ¶ 6.1(A)(ii) when it entered into the 2008 CIC Agreements.

- Because there is an ambiguity in the language of the 2000 agreement, and that language is identical to the 2008 agreements, there is an ambiguity in the 2008 agreements.

**Second**, with regard to Lind's case only, he claims:

- ¶ 6.1(A)(ii) of his CIC Agreement from 2007, which was replaced by the 2008 Agreement at issue here, explicitly stated that he was entitled to a payment of two times his highest *actual* bonus from the prior three years.

- The "Whereas" clauses in the 2008 CIC Agreement state that the intention of the new agreement is not to change the previous agreement except as necessary to accomplish the desired tax consequences. This is also confirmed by O'Neal's transmittal memo.

- The red-lined version of Lind's contract which accompanied the memo from O'Neal also did not indicate that any changes were being made to ¶ 6.1(A)(ii).

- The memo stating no intention to make changes except for tax purposes, the red-lined version indicating that ¶ 6.1(A)(ii) was not being changed, and the fact that the 2007 CIC Agreement explicitly entitled Lind to two times the highest actual bonus, creates an ambiguity regarding the meaning of the language in Lind's 2008 contract.

(In making this argument, Lind relies only on the last three categories of documents set out above.)

For their part, Defendants contend the Court may not consider any of the documents supporting these claims, as they contend Plaintiffs are offering them to create an ambiguity that does not exist in the plain language of ¶ 6.1(A)(ii).

While there are legions of cases addressing when something is or is not a surrounding circumstance which may be considered as part of an ambiguity analysis, that case law is largely fact specific, and the majority of the cases are only relevant when the same sort of surrounding circumstances are at issue in both cases. Thus, the parties' briefs focus on cases addressing the sorts of documents Plaintiffs contend the Court may consider as "surrounding circumstances," and the Court's discussion of the cases follows the parties' lead.

Two recent Texas Supreme Court cases are of particular importance here. The first is *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, PC*, 352 S.W.3d 445 (Tex. 2011), which involved a dispute over whether an attorney fee agreement was ambiguous. The client contended the plain language of the agreement established the agreement was with the law firm on whose letterhead the agreement was drafted, not the lawyer who personally signed the agreement. *Id.* at 449-50. The lawyer countered that the use of personal pronouns in the agreement, as well as surrounding circumstances, created an ambiguity that a jury was required to resolve. *Id.* In deciding the case, the court noted that:

> Understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement, but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.

*Id.* at 451 (internal citations omitted, emphasis in original).

The second relevant decision is *Houston Exploration*, mentioned earlier, which was decided the same day as *Anglo–Dutch Petroleum*. The issue in *Houston Exploration* was whether the court could consider language stricken from an insurance policy in interpreting it, or if those strike-outs qualified as parol evidence. The plaintiff-insured contended that the policy provided coverage for

11

all repair costs for its oil platform, including "standby" fees incurred when the repair company's ships and personnel waited out a storm nearby, rather than returning to shore, so that the repairs could be made more quickly. The insurer countered that the very clause of the form contract which would have expressly provided coverage for such standby fees was lined out by the parties, which the insurer contended showed that no such coverage was intended or provided by the policy. The insured argued that the lined-out language was not part of the contract, but rather was extrinsic evidence and the court was required to ignore that language and decide the case based only on the language that remained. The court concluded that it could properly consider the deletion as a "surrounding circumstance" indicative of the parties' intent, relying in part on the Restatement of Contracts' suggestion that "surrounding circumstances" include prior drafts of contracts and contract negotiations, and on two earlier Texas Supreme Court cases that allowed consideration of similar lined-out provisions in construing contracts. 352 S.W. 3d at 470-71, and n. 28 (*citing Gibson v. Turner*, 294 S.W.2d 781 (Tex. 1956); *Houston Pipe Line Co. v. Dwyer*, 374 S.W.2d 662 (Tex. 1964); and RESTATEMENT (SECOND) OF CONTRACTS §214).

Although *Houston Exploration* seems plainly to be limited to cases in which the very contract at issue contains language that has been lined through, two panels of the San Antonio Court of Appeals have read it more broadly to stand for the proposition that a court may consider evidence of prior negotiations as "surrounding circumstances." In *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 495 (Tex.App. –San Antonio 2013, pet. filed), relied upon by Plaintiffs in the hearing before the Court, that court stated:

> Surrounding circumstances include contract negotiations, and they "may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole." *[Houston Exploration]* at 469–70. "[N]egotiations prior to or contemporaneous with the adoption of a writing are

admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated." *Id.* at 470 n. 28 (second alteration in original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 214 (1981)) (internal quotation marks omitted). *See generally* RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. b, illus. 1–4 (1981) (providing examples where negotiations informed the meaning of the contract terms). The parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous. Exploration Co.*, 352 S.W.3d at 469.

*Id.* at 500.   Based on this reasoning, the San Antonio court considered evidence of the parties' negotiations, including offers and counter-offers exchanged by the parties.  *Id.* at 500–01. The opinion quotes correspondence between the parties during the negotiations and refers to requests to revise drafts, language in revised drafts, and deletions made in drafts.  *Id.*  Ultimately, the court found that the surrounding circumstances were "consistent with the lease terms [and] the negotiations inform and confirm the lease terms; they do not vary or contradict the lease provision." *Id.* at 501.

In *PNP Petroleum I, LP v. Taylor*, ---  S.W.3d ---,  2014 WL 2106572 (Tex. App.–  San Antonio, May 21,  2014) (slip op.), the same court considered the issue of whether the trial court had improperly excluded as parol evidence red-lined draft leases showing changes and deletions going back and forth between the parties during the negotiation of an oil and gas lease.  In finding that the trial court had erred in refusing to consider the drafts, the court stated:

> This court has generally adopted the language in *Houston Exploration Co.* which allows courts to consider contract negotiations as surrounding circumstances in construing a lease. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 495, 499–500 (Tex. App. –San Antonio 2013, pet. filed). In *BP Am. Prod. Co.*, we stated, "We consider surrounding circumstances as a construction aid to determine the parties' intentions as expressed in the plain language of the lease." *Id.* at 500. We noted, "'[N]egotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated.' " *Id.* (quoting *Houston Exploration Co.*, 352 S.W.3d at 470 n. 28) . . . . In *BP Am. Prod. Co.*, this court considered evidence of counter-offers made.  419 S.W. 3d at 500-01.

13

*Id.* at *8.

The holdings in both *Zaffirini* and *PNP* are plainly significant extensions of the decision in *Houston Exploration Co.* Yet in neither case does the court note that its holding goes beyond that of the Texas Supreme Court in *Houston Exploration Co.*, nor does either court explain why a ruling explicitly limited to the particular facts of that case should be read so broadly. In fact, *Houston Exploration Co.* rejects the exact reading the two panels of the San Antonio Court have given it:

> The Assureds argue that deletions in a printed form should be treated no differently than deletions in a draft, all evidence of which is omitted from the final agreement. But the law has long recognized that changes in a printed form must be accorded special weight in construing the instrument.

*Houston Expl. Co.*, 352 S.W.3d at 472. *See also id.* at 470 ("[w]e have twice held that deletions in a printed form agreement are indicative of the parties' intent); and 471 ("deletions in a printed form agreement must be considered in construing the other provisions"). The holding in *Houston Exploration Co.* is plainly limited to deletions that are contained on the face of a printed form, which are given "special weight," and the decision specifically excludes from its reach ordinary deletions made in the drafting process of non-form agreements. Thus, the San Antonio Court of Appeals' reading of *Houston Exploration Co.* is flawed, and the Plaintiffs' reliance on these cases does not aid their cause.[8]  *See e.g., Port of Houston Auth. of Harris Cnty. v. Zachry Constr. Corp.*, 377

---

[8]Additionally, *BP Am. Prod. Co.,* and *PNP Petroleum,* both rely in part on the Restatement (Second) of Contracts § 214 stating: "[N]egotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated." Close examination of the comments accompanying the Restatement, as well as its four Illustrations, suggest that use of prior agreements and negotiations are only admissible to show prior courses of trade or communications between the parties when the contract language is latently ambiguous, or there is an undefined term in a contract. The illustrations simply do not support a reading of § 214 of the Restatement as allowing language in prior versions or drafts of a fully integrated contract to be used to create an ambiguity. Consistent with this, the Texas Supreme Court has stated that "[e]vidence of prior policies is extrinsic evidence, and thus inadmissible unless the

S.W.3d 841, 859 (Tex.App.– Houston [14th Dist.] 2012, pet. filed) (distinguishing cases where language was stricken or deleted, from cases involving omitted language, finding that the parol evidence rule bars consideration of prior versions of a document to demonstrate what was removed).

Applying these principles to this case, the Court concludes that, with the exception of the agreements in place prior to the 2008 version, in ascertaining the meaning of ¶ 6.1A(ii), the Court may not consider the documents Plaintiffs have submitted because the documents do not qualify as surrounding circumstances. Nothing in the Texas Supreme Court's case law suggests red-lined drafts or memos summarizing terms may be considered in deciding whether language in a contract is ambiguous. The one exception to this is, as noted, the contracts in place immediately prior to the 2008 agreements. As discussed in the background facts, the 2008 CIC Agreement—the operative agreement for all Plaintiffs except York—replaced an earlier version. The language of the 2008 agreement explicitly noted this, and stated the parties' intention with regard to the changes contained in the 2008 agreement:

> WHEREAS, the Executive is currently a party to a Change in Control Agreement (the "Existing CIC Agreement) with Temple-Inland; and

> WHEREAS, the Company and the Executive intend this Agreement to continue to provide the protections afforded by the Existing CIC Agreement except to the extent the provisions of the Existing CIC Agreement would give rise to a tax under Section 409A of the Code or to the extent the provisions of the Existing CIC Agreement are otherwise modified herein;

Dkt. No. 25, Ex. 1 (at IPC 000293). Given this language stating that the parties intended the new agreement "to continue to provide the protections afforded by the Existing CIC Agreement," the

---

policy is ambiguous . . . . and while we have looked at a prior policy in deciding between reasonable constructions of a current one, we have never done so in lieu of construing the current one at all." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006).

"surrounding circumstances" that existed when the new agreements were entered into should properly include the superceded—or "Existing"—agreements.

The inclusion of the earlier versions, however, makes no difference to the ambiguity analysis for Zimbelman, Holland or Paul, as the text of ¶ 6.1(A)(ii) in each of their prior agreements was identical to that contained in the 2008 CIC Agreement. Lind's agreement, however, presents a different case. As noted in the factual section, Lind's 2007 CIC Agreement stated that if there were a triggering change in control event, he was entitled to two times his

> target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination (or if higher, *the greatest actual annual bonus* in respect of any of the three preceding fiscal years.

Dkt. No. 21, Ex. 4 (emphasis added, closed parentheses omitted in original). Thus, unlike the other Plaintiffs, each of whose contract stated that he was entitled to two times the target bonus in the year of termination, or, if higher, "in respect of any of the three preceding years," Lind's agreement before 2008 plainly granted him the right to receive, if higher than his target bonus in the year of termination, two times the highest *actual* bonus from the previous three years. Notwithstanding this, and notwithstanding the language of the "Whereas" clause suggesting only tax changes were intended with the 2008 agreement, Lind's 2008 CIC Agreement altered ¶ 6.1(A)(ii) to match that of all of the other Plaintiffs, as the 2008 agreement removed the italicized language in the indented quotation above.

At the hearing, Lind contended that when ¶ 6.1(A)(ii) of his 2007 CIC Agreement is read in conjunction with the 2008 CIC Agreement, and specifically the Whereas clauses, an ambiguity arises regarding what was intended with the language of ¶ 6.1(A)(ii) in the (operative) 2008 CIC Agreement. While the Court believes it is possible that a mistake was made with regard to the

changes in Lind's 2008 agreement, it disagrees that the language of ¶ 6.1(A)(ii) is any more ambiguous in Lind's agreement than it is in any of the other Plaintiffs' agreements.  Indeed, that outcome would be odd to say the least, given that all five agreements contain identical language. First, this argument fails to consider an important clause at the end of the relevant Whereas clause. When read in full, the clause states that the parties intend the 2008 agreement to provide the same protections provided by the prior agreement, "except to the extent that the [prior agreement] gives rise to a tax under Section 409A of the Code, or *to the extent the provisions of the [prior agreement] are otherwise modified herein*."  This last clause indicates that the parties' intention was that the 2008 agreement  would provide the same protections as Lind's 2007 agreement, unless the terms of the 2007 agreement were "otherwise modified."  Plainly in Lind's case the terms of ¶ 6.1(A)(ii) were modified from the 2007 to the 2008 agreement.  Thus when the italicized language of the Whereas clause is considered, there is nothing ambiguous about the change made to ¶ 6.1(A)(ii) in Lind's 2008 agreement.

Second, the claim that Lind has made in this case is a breach of contract claim, predicated on the assertion that the language of ¶ 6.1(A)(ii) of the 2008 agreement is ambiguous.  Yet the facts Lind relies on to support his claim would more properly support a claim of negligent misrepresentation or mutual mistake than ambiguity.  As noted earlier, the evidence Lind has submitted suggests that somewhere in the changeover from his 2007 agreement to his 2008 agreement, a mistake was made.  For example, the evidence could support a claim that TIN was negligent in making representations to Lind that all of the changes it was making to the 2007 agreement were red-lined in the draft sent with O'Neal's memo.  The evidence might also support a claim that the parties did not intend to make a change to ¶ 6.1(A)(ii) of Lind's agreement, but did

so accidentally. Unquestionably, ¶ 6.1(A)(ii) of Lind's 2007 agreement contained materially different language than that of any of the other Plaintiffs. Whether TIN wished to make all of the agreements identical in 2008, or TIN and Lind overlooked the difference in his agreement, is unclear. But none of these facts are relevant to Lind's breach of contract claim—the only claim before the Court. As discussed below, the Court finds that the language of ¶ 6.1(A)(ii) in all of the Plaintiffs' *operative* CIC Agreements, including Lind's, is susceptible of a single, definite interpretation. Because "[e]xtrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated," *see Anglo-Dutch Petroleum,* 352 S.W.3d at 451, even in Lind's case the Court may not rely on these other documents to conclude that Lind and TIN probably meant to do something other than what they actually did with regard to the version of ¶ 6.1(A)(ii) contained in Lind's 2008 agreement.

### 2.   Ambiguity arguments based solely on the language of the CIC Agreements

Because the Court has concluded that it may not consider the non-contract documents as surrounding circumstances, the Court must determine the parties' contractual rights and duties based solely on the language of the CIC Agreements themselves, unless it determines *that* language is ambiguous, without resort to the other evidence the Plaintiffs have offered. Plaintiffs make two ambiguity arguments based solely on the language of the 2008 agreement. First, they contend that Section 6.1(A)(ii) of the CIC Agreement is patently ambiguous due to grammatical ambiguities. And second, they argue that the lack of a definition in the contract for "target annual bonus" creates a latent ambiguity.

With regard to alleged grammatical ambiguities, Plaintiffs make several arguments. It is easiest to begin this discussion with the Defendants' construction of ¶ 6.1(A)(ii): the executive is

entitled to two times his: "target annual bonus . . . in respect of the fiscal year . . . of [his] Termination . . . or, if higher, in respect of any of the three preceding years." Defendants argue that because the identical phrase "in respect of" is used twice in the sentence, it must be read to relate back to the same object—the "target annual bonus." In support of this argument, they cite the principle that "modifying words or phrases are presumed to apply to the words or phrases that immediately precede them and not those more remote." *Abbott v. Texas Bd. of Nursing*, 2010 WL 392335 (Tex. App. – Austin 2010, no pet.). Defendants assert that both "in respect of" phrases modify the preceding and only object in the sentence –"target annual bonus." In response, Plaintiffs point out that:

> to make their argument, Defendants had to delete several terms between "target annual bonus" and "in respect of." In fact, the nearest antecedent to "in respect of" is "any annual bonus or incentive plan." But that phrase is itself patently ambiguous. It could be read as "any annual bonus . . . maintained by the company" or as "any annual bonus . . . plan maintained by the company." What noun or noun phrase is parallel to incentive plan? Is it bonus or bonus plan? If the latter, bonus plan is actually functioning adjectivally, as a parallel to the adjectival use of incentive in the phrase incentive plan. But it could be that annual bonus is a noun phrase that is parallel to the noun phrase incentive plan. Further, does "annual" modify "bonus" alone or "bonus . . . plan" and "incentive plan"? In short, the provision contained in Paragraph 6.1(A)(ii) is rife with ambiguity.

Dkt. No. 21 at 14.

While creative, Plaintiffs' grammatical arguments ultimately fail to read the sentence as a whole, and instead parse it to create ambiguities. That relevant language is far less complex than Plaintiffs suggest:

> two times  . . . the Executive's target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination (or if higher, in respect of any of the three preceding fiscal years).

19

Dkt. No. 18, Exs. A-1 to A-5 at ¶ 6.1(A)(ii).  The phrase "any annual bonus or incentive plan" does not stand alone in the sentence, as Plaintiffs suggest.  Instead, it is a descriptive phrase, and actually contains more—"in respect of the fiscal year in which occurs the Date of Termination."  This language is plainly describing a plan for annual bonuses or incentives maintained by Temple-Inland ("the Company") in the fiscal year in which the executive is terminated.  It is undisputed that Plaintiffs were all terminated in early 2012.  Thus, read plainly, the phrase "any annual bonus or incentive plan maintained by the Company in respect of the fiscal year in which occurs the Date of Termination" means TIN's 2012 bonus plan.  Further, even the descriptive phrase does not stand alone, as it is directly linked to the words "target annual bonus" by the connector "pursuant to." When these three phrases are placed together—as they are in the contract—we have plain language describing the Executive's target bonus contained in TIN's 2012 bonus plan.  This could be shortened to "the target bonus for 2012."  The parenthetical changes none of this.  The Defendants are correct that because the words "in respect of the fiscal year in which occurs the Date of Termination" refers to the "target annual bonus," the parenthetical phrase "in respect of any of the three preceding fiscal years" also refers to the "target annual bonus."  Any other construction is strained, to say the least.  In short, the only reading of the contract language that is reasonable is that it states that each Plaintiff is entitled to two times their highest target bonus for any of the years from 2009 to 2012.  The Court therefore rejects the Plaintiffs' claim that there are grammatical ambiguities in ¶ 6.1(A)(ii).

Plaintiffs also assert that because "target annual bonus" is not defined in the 2008 CIC Agreement, it has no real meaning without extrinsic evidence, and there accordingly is a latent

ambiguity in ¶ 6.1(A)(ii).[9]  Defendants respond that "target annual bonus" is in fact defined in the CIC as the "target annual bonus pursuant to any annual bonus or incentive plan maintained by the Company in respect to the fiscal year in which occurs the date of Termination."  Defendants submit summary judgment evidence that at the time of Plaintiffs' terminations, each division of TIN had a "Management Incentive Plan" and that each executive had a "target incentive" set at 50% of their salary.  Dkt. No. 26, Ex. A at ¶ 6.  Copies of the relevant plans have been submitted as well.  *Id.* at Exs. A-16 & A-17.   Plaintiffs offer no evidence to dispute this.

When a term is not specifically defined by a contract a court must give the term its "plain, ordinary and generally accepted meaning," unless the contract itself shows it to have been used in a different sense.  *Mescalero Energy, Inc.  v. Underwriters Indem. Gen. Agency, Inc.*, 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).  On the other hand, when the contract defines a term, a court may not "disregard those definitions and substitute other meanings." *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex.App.—Tyler 2005, no pet.).  Even when a term is not defined, "courts may refer to extrinsic evidence such as industry dictionaries or statutory definitions to determine the commonly understood meaning" of the term.  *Mescalero Energy*, 56 S.W.3d at 323 (citing *Amarillo Oil Co. v. Energy-Agri Products, Inc.*, 794 S.W.2d 20, 23 n.3 (Tex. 1990)).  Numerous courts have appealed to such "outside" definitions to interpret a contract term.  *See, e.g.*, *Heritage Resources, Inc. v. Nations-Bank,* 939 S.W.2d 118, 121-22 (Tex.1996); *Ramsay v. Maryland American General Ins. Co.,* 533 S.W.2d 344, 346

---

[9]They rely on the principle that when a contract uses a term that is not defined, it may create a latent ambiguity in the contract.  *See Quality Infusion Care, Inc.*, 224 S.W.3d 369, 379-80 (Tex. App. – Houston [1st Dist.] 2006) (no pet.);  *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.– Tyler 2005, no pet.); *AMS Constr. Co. v. K.H.K Scaffolding Houston, Inc.*, 357 S.W.3d 30, 41 (Tex.App. – Houston [1st Dist.] 2011) (pet.dismissed).

(Tex.1976). *See also Topp, Inc. v. Uniden America Corp.*, 207 WL 3256849 at *3 (S.D. Fla. Aug. 23, 2007) (applying Texas law).

Under either approach, Plaintiffs' claim of a latent ambiguity fails. First, the Court agrees with Defendants that the contract itself defines "target annual bonus" with the language "pursuant to any annual bonus or incentive plan maintained by the Company in respect to the fiscal year in which occurs the date of Termination." As noted, there is no dispute that a Management Incentive Plan that creates a "target incentive" for each Plaintiff existed for 2012. From this, the Court concludes that the term was in fact defined by the contract. And even if the Court did not view this language as a definition, it would be appropriate to look to the Management Incentive Plan to elucidate the term under the *Mescalero* line of cases. A recent case from the Southern District of Texas is instructive. There, Judge Ellison rejected a party's argument that the phrase "Bevelo marks" was ambiguous because not defined in a contract:

> the failure to define the term "Bevolo marks" does not render the term ambiguous, because, among the ordinary meanings of the word "mark," are "trademark" and "service mark." *See Black's Law Dictionary* 1055 (9th ed. 2009); *see also Merriam–Webster Online Dictionary*, http://www.merriamwebster. com/dictionary/mark (last visited July 18, 2013). Indeed, in the context of the contract, "trademark" and "service mark" are the only meanings of the term "mark" that make sense. Lagniappe does not offer an alternate reasonable interpretation of the term "Bevolo marks."

2013 WL 3816591 at *7 (S.D. Tex. July 22, 2013). Just as in that case, here the only definition of "target annual bonus" that makes sense is the target incentive contained in the Management Incentive Plan, and Plaintiffs have failed to offer any other reasonable alternative definition of the term. Accordingly, the Court finds that "target annual bonus" unambiguously refers to the target incentive set forth in relevant Management Incentive Plans, and does not create a latent ambiguity in the CIC Agreements.

22

**C.      Application of the agreements' plain language**

Because the Court concludes that there is no ambiguity in the CIC Agreements, the dispute regarding the proper bonus payment due to the Plaintiffs must be decided based on the plain language of the agreements.  As noted above, the plain language of the contract states that under ¶ 6.1(A)(ii), each Plaintiff is entitled to two times their highest target bonus for any of the years from 2009 to 2012.  The MIP set the target incentive at 50% of each of the Plaintiff's salaries, and the highest salary for each Plaintiff between 2009-2012 was in 2012.  Thus, each Plaintiff is entitled to two times their 2012 target incentive.  The summary judgment evidence indicates that this is in fact the manner in which Defendants calculated this portion of each Plaintiff's payment under the CIC Agreements.  Dkt. No. 26, Ex. 1 at ¶¶ 4-10.  Accordingly, with regard to this issue, Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim that their bonuses were not properly calculated pursuant Section 6.1(A)(ii) of the CIC Agreements, and Plaintiffs' motion for summary judgment seeking a ruling that ¶ 6.1(A)(ii) is ambiguous should be denied.

## III.  RECOMMENDATION

Based upon the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the District Judge **GRANT** Defendants' Partial Motion for Summary Judgment with regard to the breach of contract claim under ¶ 6.1(A)(ii) (Dkt. No. 18); **DENY** Plaintiffs' Cross-Motion on Ambiguity (Dkt. No. 21); and **DENY** both motions to the extent they seek any other relief.

## IV.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are

being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 21st day of August, 2014.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

24